# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00280-CR

---

**Artavias Edwards, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 8 OF TRAVIS COUNTY
NO. C-1-CR-24-202542, THE HONORABLE CARLOS HUMBERTO BARRERA, JUDGE
PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Artavias Edwards was charged with the offense of driving while intoxicated ("DWI") with a blood-alcohol level of .15 or more. *See* Tex. Penal Code § 49.04. Following a trial, the jury found him guilty of the charged offense. He elected to have the trial court impose his sentence, and the trial court sentenced him to 30 days in jail. *See id.* § 12.21. On appeal, he contends that the trial court erred by failing to grant his motions to suppress evidence and his motion for mistrial. We will affirm the trial court's judgment of conviction.

## BACKGROUND

Around 7:30 p.m. on March 11, 2024, an employee working at the front desk of an apartment complex noticed a white Escalade driving slowly in the parking lot. The driver was later identified as Edwards. When the Escalade nearly hit the employee's car, she remotely

activated her car's alarm to alert Edwards and prevent a collision. Edwards then drove the Escalade away from the employee's car and parked on the other side of that parking lot. The employee contacted the apartment's security officer, who approached the Escalade.

After parking the Escalade, Edwards walked to the apartment complex's reception area from where the employee had been observing him. When Edwards entered the building, the employee noticed that he smelled like alcohol. She also noticed that his speech was slurred and that he appeared disoriented. He briefly walked to another part of the building then returned to his car and drove out of that section of the parking lot. The employee later discovered the Escalade on the back side of the property in another parking lot and noticed that the vehicle was not parked properly within a single space. The employee also noticed Edwards inside the vehicle asleep and called 911.

Officer Andrew Blissit was the first police officer to respond to the call, and he arrived at the complex around 8:30 p.m. Upon arriving, the officer noticed the Escalade parked across two spaces and noticed Edwards asleep in the driver's seat. The keys were in the ignition, but the engine was off. The officer knocked on the driver's window and shined his flashlight into the vehicle, waking Edwards. While talking with Edwards, the officer noticed that Edwards had bloodshot eyes and was talking slowly. The officer also observed that the inside of the vehicle smelled like alcohol and later found a cup in the center console that was half full and smelled like alcohol. Although the officer found Edwards in the Escalade, the officer never personally saw Edwards drive it.

A second officer, Officer Ehlar Htoo, arrived a few minutes after Officer Blissit. Although Officer Htoo also did not see Edwards driving, the apartment employee showed the officer surveillance footage documenting the Escalade's being driven around the parking lots and

2

Edwards's movements on the property when he got out of the Escalade, walked to the apartment building, and later returned to the Escalade. The officer took over the case and conducted a DWI investigation.

Officer Htoo approached Edwards and asked him a series of questions. In response, Edwards related that he believed it was 1:00 a.m. even though it was 8:50 p.m. at that time, admitted to having consumed alcohol earlier in the day, and stated that he had driven hours earlier. Edwards later asserted that he had not driven that day. Edwards told the officer that his leg had been injured previously. The officer detected an odor of alcohol coming from Edwards, noticed that he had bloodshot eyes, and observed that his speech was slurred.

After interacting with Edwards, Officer Htoo asked Edwards to submit to field-sobriety testing. Edwards performed the testing but asked for his attorney repeatedly. During the testing, the officer noticed that Edwards had difficulty following directions. Edwards exhibited all six indicators of intoxication during the horizontal gaze nystagmus ("HGN") test, six of eight indicators during the walk-and-turn test, and three of four indicators during the one-leg stand test. During the one-leg stand test, Edwards was given the option to stand on whichever leg he wanted. The officer concluded that Edwards was intoxicated, arrested him, and read him the statutory warnings for obtaining a breath or blood sample. Edwards refused to provide either type of sample. The officer drafted an initial version of a probable-cause affidavit to obtain a search warrant for Edwards's blood and sent it to Detective Jason Day from the impaired driving unit for review.

After reviewing the probable-cause affidavit and making edits, Detective Day presented the affidavit to a magistrate, who then issued a search warrant for Edwards's blood. A paramedic performed the blood draw around 11:00 p.m., and subsequent testing on the sample

3

revealed that Edwards's blood-alcohol level was over .30. Edwards was subsequently charged with the offense of DWI with a blood-alcohol level of .15 or more.

During the trial, the State called as witnesses the apartment employee, the two officers who responded to the 911 call, the detective who submitted the probable-cause affidavit, the paramedic who performed the blood draw, and the forensic scientist who performed the blood-alcohol testing. The witnesses testified regarding the events set out above. Additionally, the State successfully sought to have admitted into evidence a recording of the 911 call, the surveillance footage that the employee showed Officer Htoo, body camera footage from the two officers who responded to the apartment complex, and a video recording of the blood draw.

In his case-in-chief, Edwards elected to testify. Although he admitted to being intoxicated when the officers arrived around 8:30 p.m. and conceded that he was intoxicated on the recordings, he denied drinking anything until after parking the Escalade and interacting with the apartment employee around 7:30 p.m. More specifically, he testified that he drove to the apartment complex, entered the parking lot, parked his car, went to his apartment, made a drink, returned to his vehicle, and intentionally fell asleep in his car. When discussing his drinking that day, he related that he decided to drink because he had run out of his mental-health medication and had been unable to renew his prescription. He felt that drinking alcohol would minimize his mental-health symptoms and help him sleep. He decided to sleep in his vehicle rather than in his apartment because he believed he was less likely to hurt himself if he were in his vehicle. When discussing the field-sobriety testing, he testified that his performance was affected by injuries he sustained previously when a truck hit him.

Next, Edwards called a forensic psychiatrist as an expert witness. In her testimony, the psychiatrist explained that Edwards had been taking two mental-health

4

medications around the time in question: one for anxiety and one for depression. She testified that the anti-anxiety medicine had no withdrawal symptoms. Regarding the anti-depressant, she explained that withdrawal from it could lead to severe symptoms, but she also explained that withdrawal symptoms were usually mild.

After considering the evidence, the jury found Edwards guilty of the charged offense, and the trial court later sentenced him to 30 days in jail.

## DISCUSSION

In his first issue on appeal, Edwards contends that the trial court erred by denying his motion to suppress the blood-alcohol test results because the probable-cause affidavit forming the basis for the search warrant contained a material misrepresentation. In his second issue, he argues that the trial court erred by failing to grant his motion to suppress evidence of his field-sobriety testing because the police continued the investigation and sobriety testing even though he repeatedly invoked his right to counsel. In his final issue, he asserts that the trial court erred by denying his motion for mistrial made during the apartment employee's testimony.

### Probable Cause Affidavit

Before the trial started, Edwards filed a motion to suppress arguing, among other things, that the evidence pertaining to his arrest and the blood testing should be suppressed because the probable-cause affidavit serving as the basis for the search warrant for his blood was defective because it inaccurately stated that Officer Blissit observed Edwards driving. The relevant portion of the affidavit at issue contained a narrative summarizing what the two officers observed when they responded to the 911 call and interacted with Edwards and provided as follows:

5

I / Officer **BLISSIT, ANDREW – [badge #]** observed the aforesaid accused ☑ driving ☐ operating the following vehicle, [Escalade description] upon [apartment address] a public place in Austin, Texas.

On 3/11/24 at approximately 20:33, Officer **HTOO, EHLAR D – [badge #]** contacted **Artavias Edwards** (Black / Male born [], height 5'10, weight 185, DL # [] for the following reasons: On March 11, 2024, at approximately 2033 Officer Htoo [] responded to a suspicious vehicle at [apartment address]. The call text stated that an intoxicated male was driving a white Cadillac Escalade Tx Lp [] in the parking lots. The call text also stated that the driver fell asleep behind the wheel and did not park his vehicle properly. Upon arrival, Ofc. Blissit saw the above described vehicle and observed a male later identified as EDWARDS, ARTAVIAS B/M who appeared to be passed out as he was slumped forward and to his right with his arms limp. He noticed the car engine was off but the keys were in the ignition. Ofc. Blissit opened the door and he observed Edward to have very glassy, bloodshot eyes as he looked toward him. Ofc. Blissit also noticed Edward[s] ha[d] slurred speech and a moderate odor of alcoholic beverage was emanating from inside the vehicle. [Apartment employee] was working at the front desk with a clear view of the parking lot. She observed the Cadillac park, and [security officer] contacted the driver, who parked the car. The driver exited his vehicle and entered the office, standing across from [apartment employee]'s desk. From about five feet away, [apartment employee] stated she could smell a strong odor of alcohol emanating from the driver. Officer Htoo also saw the camera footage of EDWARDS ARTAVIAS driving the above vehicle in the parking lots. When Officer Htoo spoke with Edward[s], he could smell a[] strong odor of alcoholic beverage coming from his breath.

(Underlining omitted).

The affidavit also stated that Officer Htoo observed Edwards at the scene and determined that Edwards was intoxicated based on his clothing appearing disorderly and his bloodshot and glassy eyes, slurred speech, sway when walking, smell of alcohol, wobble, and uncooperative behavior. Further, the affidavit set out the results of the field-sobriety testing performed. Finally, the affidavit reflected that Edwards refused to submit to a breath test and a blood draw.

After voir dire, Edwards repeated his claim that the evidence obtained through the search warrant should be suppressed because the probable-cause affidavit was defective, and he

6

explained that he would be requesting that the evidence be suppressed after some of the witnesses testified about the affidavit. Later, during a hearing held outside the presence of the jury, the parties questioned Officer Htoo about the probable-cause affidavit. At the hearing, the officer explained that he prepared the affidavit and gave it to Detective Day, who reviewed, edited, and signed it, and then applied for the search warrant. The officer agreed that the affidavit included a statement that there was a video showing Edwards driving that night. Regarding the video, he related that the apartment employee texted him a link containing the footage and that he watched it on his phone while still at the apartment complex. Further, the officer acknowledged that the affidavit specified that Officer Blissit observed Edwards driving. Officer Htoo agreed that if Officer Blissit arrived after the vehicle had been turned off and did not see the surveillance footage, then Officer Blissit did not see Edwards driving that night. Following this exchange, the trial court called the jury back in, and Officer Htoo continued testifying.

Between the testimony of the paramedic and that of the forensic scientist, Edwards moved to suppress the evidence obtained through the search warrant because the probable-cause affidavit contained a material misrepresentation stating that Officer Blissit observed Edwards driving. The State responded by arguing that police officers are allowed to rely on statements from witnesses such as the apartment employee and that the employee showed the officers surveillance footage of Edwards driving. Accordingly, the State argued that there was no material misrepresentation. Alternatively, the State asserted that even without the alleged misrepresentation, the affidavit still provided a basis to conclude that there was probable cause for a search warrant. After considering the parties' arguments, the trial court said it "had ruled" and did not suppress the evidence at issue. *See State v. Kelley*, 20 S.W.3d 147, 153 n.3 (Tex.

7

App.—Texarkana 2000, no pet.) ("Appellate courts will generally find that a trial court made an implicit ruling on an objection when the objection was brought to the trial court's attention and the trial court's subsequent action clearly addressed the complaint.").

On appeal, Edwards contends that the checked box in the affidavit reflecting that Officer Blissit observed Edwards driving "was a serious, reckless[] misrepresentation" because the officer testified at trial that he "did not observe driving" and that the misrepresentation misled the magistrate. Additionally, he asserts that the remaining portions of the affidavit did not provide a basis to determine that probable cause existed. Accordingly, Edwards urges that the trial court should have granted his motion to suppress the evidence obtained through the search warrant.

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). Moreover, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). When reviewing a magistrate's probable-cause determination, the reviewing court employs a "highly deferential standard," *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007),

8

and should uphold a determination of probable cause provided that the magistrate had a "'substantial basis'" from which he could conclude "that a search would uncover evidence of wrongdoing," *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

To be proper, an accompanying affidavit must provide enough information to allow a magistrate to determine if probable cause exists and to ensure that the magistrate's determination is not "a mere ratification of the bare conclusions of others." *Id.* at 239; *see Franks v. Delaware*, 438 U.S. 154, 165 (1978) (explaining that affidavit "must set forth particular facts and circumstances underlying the existence of probable cause" that allow "magistrate to make an independent evaluation of the matter"); *Mayfield v. State*, 800 S.W.2d 932, 934 (Tex. App.—San Antonio 1990, no pet.) (explaining that affidavit must contain "sufficient information" to support probable-cause finding). Under the United States Supreme Court's decision in *Franks*, an arrest warrant must be voided and any evidence obtained pursuant to the arrest warrant suppressed if (1) the defendant can establish by a preponderance of the evidence that the affidavit supporting the warrant contains a material misstatement that the affiant made knowingly, intentionally, or with reckless disregard for the truth; and (2) setting the false statement aside, the affidavit's remaining content is insufficient to establish probable cause. 438 U.S. at 155-56; *Janecka v. State*, 937 S.W.2d 456, 462 (Tex. Crim. App. 1996); *see also Emack v. State*, 354 S.W.3d 828, 838 (Tex. App.—Austin 2011, no pet.) (noting that "it is the defendant's burden to prove the alleged perjury or reckless disregard for the truth by a preponderance of the evidence"). Although the Fourth Amendment requires a truthful factual showing for determining probable cause, that requirement does not mean that each recited fact has to be precisely accurate, "for probable cause may be founded upon hearsay and upon

information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks*, 438 U.S. at 164-65. "Rather, 'truthful' in this context means that the information put forth in the affidavit is believed or appropriately accepted by the affiant as true." *Sponsler v. State*, No. 03-11-00654-CR, 2013 WL 6002763, at *6 (Tex. App.—Austin Nov. 8, 2013, pet. ref'd) (mem. op., not designated for publication).

In his suppression motion, Edwards asserted that the evidence should be suppressed under the United States Constitution and the Texas Constitution. "Both the Federal and the Texas Constitutions dictate that no search warrants may be issued without probable cause." *Kennedy v. State*, 338 S.W.3d 84, 91 (Tex. App.—Austin 2011, no pet.) (citing U.S. Const. amend. IV; Tex. Const. art. I, § 9). Probable cause determinations under both constitutions apply the same standard. *See Dixon v. State*, 206 S.W.3d 613, 616 n.6 (Tex. Crim. App. 2006); *State v. Garrett*, 22 S.W.3d 650, 653 (Tex. App.—Austin 2000, no pet.).

"When determining whether probable cause exists to issue a search warrant, courts should be mindful of the proposition that there is a 'strong preference for searches conducted pursuant to a warrant' over searches conducted without a warrant." *Kennedy*, 338 S.W.3d at 91 (quoting *Gates*, 462 U.S. at 236). "Because of the preference to be given search warrants, a search incident to a warrant may be upheld in doubtful or marginal cases in which a search without a warrant would be unsustainable." *Id.*; *see also Gates*, 462 U.S. at 240 (explaining that preference for warrants is based on idea that it is better practice to allow neutral magistrate to review evidence rather than officers engaged in competitive field of crime fighting). Accordingly, "[s]earches justified by a valid warrant have a presumption of legality

10

unless the opponent produces evidence rebutting the presumption of proper police conduct." *Pacheco v. State*, 347 S.W.3d 849, 855 (Tex. App.—Fort Worth 2011, no pet.).

"When determining whether probable cause exists, courts should consider the totality of the circumstances" and should rely on the facts found within the four corners of the accompanying affidavit. *Kennedy*, 338 S.W.3d at 91-92. Reviewing courts should not apply a "rigid application of the rules concerning warrants" and should instead "review technical discrepancies" in the "issuance and execution of the warrant" "with a judicious eye"; "[t]o do otherwise would defeat the purpose behind the warrant requirement, and provide protection for those to whom the issue on appeal is not one based upon the substantive issue of probable cause but of technical default by the State." *Green v. State*, 799 S.W.2d 756, 757-58 (Tex. Crim. App. 1990). Moreover, when construing the language contained within affidavits and search warrants, courts "must do so in a common sense and realistic fashion and avoid hypertechnical analysis." *Faulkner v. State*, 537 S.W.2d 742, 744 (Tex. Crim. App. 1976). "As part of their probable-cause assessment, magistrates are permitted to make reasonable inferences from the information in the affidavit." *Kennedy*, 338 S.W.3d at 92. "Ultimately, the magistrate must determine whether 'given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238).

Even absent the portion of the affidavit specifying that Officer Blissit saw Edwards driving, there was sufficient information in the remainder of the affidavit from which the magistrate could have reasonably determined that probable cause was present to justify the search warrant for a sample of Edwards's blood. *See Franks*, 438 U.S. at 155-56. The affidavit

11

specified that the apartment employee, who was named in the affidavit, reported to the responding police officers that she observed Edwards driving and that he smelled like alcohol when he later walked into the office where she was. *See Rios v. State*, 376 S.W.3d 238, 243 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (determining that even if problematic portion of affidavit were excised, statement attributable to eyewitness to offense "alone" was "sufficient to establish probable cause"). Moreover, the affidavit related that Officer Blissit found Edwards asleep in his car and noticed that Edwards smelled like alcohol, had bloodshot eyes, and had slurred speech. *See Hogan v. State*, 329 S.W.3d 90, 96 (Tex. App.—Fort Worth 2010, no pet.) (noting that inclusion of similar observations in affidavit helped establish probable cause).

Further, the affidavit specified that Officer Htoo watched surveillance footage showing Edwards driving in the apartment parking lot. *See Rios*, 376 S.W.3d at 242, 243 (noting that officer included in probable-cause affidavit descriptions of offense that he observed when reviewing surveillance footage). Additionally, the affidavit stated that Officer Htoo also smelled alcohol on Edwards's breath. *See Hogan*, 329 S.W.3d at 96 (explaining that affidavit's statement that defendant smelled like alcohol helped establish probable cause).

Moreover, the affidavit summarized the results of Edwards's field-sobriety testing, including that he exhibited all indicators of intoxication during the HGN test, six of eight indicators during the walk-and-turn test, and three of four indicators during the one-leg stand test. *See id.* (noting that inclusion of performance on field-sobriety tests in affidavit helped establish probable cause). The affidavit also specified that Edwards refused to provide a breath sample. *See id.* (highlighting affidavit's statement that defendant refused to provide breath sample when concluding that affidavit established probable cause). Finally, the affidavit stated that Officer Htoo determined that Edwards was intoxicated based on the officer's observations at

the scene. *See State v. Crawford*, 463 S.W.3d 923, 930 (Tex. App.—Fort Worth 2015, pet. ref'd) (listing officer's suspicion that defendant "was intoxicated at the time" of traffic stop as one of facts in affidavit that provided basis for probable cause).

In light of the preceding, we conclude that the affidavit provided a substantial basis to support the magistrate's probable-cause determination that Edwards had been driving while intoxicated and that based on "the totality of the circumstances recounted within the four corners of the affidavit in this case," excising the portion asserting that Officer Blissit observed Edwards driving, "the magistrate was well within [the magistrate's] discretion to issue the warrant authorizing a draw of [Edwards's] blood for evidence that []he had committed the offense of driving while intoxicated." *See State v. Webre*, 347 S.W.3d 381, 386 (Tex. App.—Austin 2011, no pet.). Accordingly, we conclude that the trial court did not abuse its discretion by denying Edwards's motion to suppress and overrule his first issue on appeal.

**Motion to Suppress Field-Sobriety Testing**

In his second issue, Edwards contends that the trial court erred by failing to grant his motion to suppress the results of the field-sobriety testing in this case as well as the recording of the testing. On the recording, the officers who responded to the 911 call approached the Escalade and asked Edwards if he had driven there. Edwards said he had driven hours earlier and admitted to drinking alcohol earlier. The officers asked Edwards to get out of the car and performed a pat-down search. The officers said that they would like to perform a few tests if he was okay with that. Edwards asked if he could call his attorney. The officers responded that he could make the call shortly. The officers moved Edwards to a nearby section of the parking lot. Officer Htoo then asked if he had any medical conditions, and Edwards pointed to an injury on

13

one of his legs and said that he had been diagnosed with bipolar disorder. Officer Htoo asked how Edwards arrived at the complex, and Edwards asked if he could call his attorney. The officers responded by saying he could make the call in a minute. In response to questioning about the time, Edwards estimated that it was one in the morning.

Edwards told the officers that he would take any test that they wanted to give him. Officer Htoo asked Edwards if he had anything to drink, and Edwards said he had drunk one beer earlier. When asked how intoxicated he felt on a scale of one to ten, Edwards said that he felt like he was at one. Officer Htoo then began the HGN test, and Edwards asked if he could call his attorney. Officer Htoo said he could call after the testing was over. Officer Htoo then gave instructions for performing the HGN test. When asked if he understood, Edwards inquired whether he could call his attorney. Officer Htoo again stated that Edwards could call his lawyer later. Edwards had difficulty complying with the directions for the testing, repeatedly complained that Officer Htoo was moving his flashlight too quickly, and expressed that the test was difficult to perform.

After several minutes, Officer Htoo directed Edwards to perform the walk-and-turn test, and Edwards twice asked to call his attorney. Officer Htoo and another officer explained that Edwards could call his attorney afterwards and that they would not stop the investigation. Edwards did not comply with the officers' instructions when performing the test. Officer Htoo then provided instructions for the one-leg stand test and told Edwards he could use whichever leg he preferred. Edwards repeatedly asked Officer Htoo to look at his leg before asking if he could call his attorney. After Edwards said he could not perform the test several times, he briefly attempted it before ultimately saying he could not complete it because he kept "swinging back and forth." At various points in their encounter with Edwards, the officers

14

explained that if Edwards decided not to perform the tests, the officers would consider that a refusal.

Following this exchange, Officer Htoo and another officer placed Edwards under arrest for DWI, placed him in handcuffs, and moved him to the back of a patrol car. When the officers read the DWI statutory warnings and asked if Edwards would provide a breath or blood sample, Edwards repeatedly asked the officers to call him an attorney. The officers told Edwards that he could ask for an attorney when they drove to jail. Officer Htoo asked Edwards if he would consent to provide a sample, and Edwards did not respond. Edwards then persistently insulted Officer Htoo and the other officers present at the scene. When Officer Htoo and another officer drove Edwards to jail, the officers did not ask Edwards any questions or respond to Edwards's insults, and Edwards eventually fell asleep.

Prior to trial, Edwards filed a motion to suppress the evidence pertaining to his interactions with the police, including the recordings of those interactions, because the police continued questioning him despite his asking for his lawyer multiple times. During a hearing held outside the presence of the jury, Edwards argued that the evidence should be suppressed under the Texas Constitution because the field-sobriety tests were "the equivalent of [giving] evidence against himself." Further, he asserted that he was not free to leave the encounter and that he was mentally coerced. The State responded that field-sobriety tests are investigatory and non-testimonial, meaning that Edwards was not being compelled to provide evidence against himself. The trial court denied the motion to suppress but did not file any findings or conclusions regarding its ruling.

On appeal, Edwards contends that the motion should have been granted for several reasons. First, he argues that he repeatedly requested an attorney but that the DWI

15

investigation and field-sobriety testing continued anyway. Based on the preceding, he suggests that the investigation continued in violation of his constitutional right to an attorney. Second, he asserts that the recordings were taken in violation of his constitutional right not to incriminate himself. We understand him to urge that the police officers were compelling him to perform the sobriety testing, which forced him to incriminate himself. In this argument, he again notes that he asked for an attorney repeatedly and suggests that the requests indicated that he was trying not to incriminate himself. Further, he asserts that he was having a mental-health crisis prior to and during the testing and that he subjectively "did not think he could refuse anything that the officers were asking him to do" even if objectively "he may have been able to refuse." For these reasons, he suggests that "[t]here should be an exception" in circumstances like these to prevent a defendant from being "compelled to comply" and that the suppression ruling should be reversed.

As set out previously, appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *See Hrehocik v. State*, 729 S.W.3d 496, 502 (Tex. App.—Austin 2025, no pet.). In a suppression hearing, the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to give to their testimony. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). When reviewing a suppression ruling, appellate courts view the record "in the light most favorable to the trial court's determination." *Story*, 445 S.W.3d at 732. In general, appellate courts apply a bifurcated standard, *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021), in which they give almost total deference to the trial court's findings of fact and review de novo the application of the law to the facts, *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). "Thus, the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that

16

may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

That same deferential standard applies to the trial court's determination of historical facts, even if that determination is based on a video recording admitted into evidence at a suppression hearing. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013); *see State v. Garcia*, 569 S.W.3d 142, 149 (Tex. Crim. App. 2018) (noting that on matters of historical fact, trial judge is in better position than appellate court to settle disputes). However, appellate courts review de novo "'indisputable visual evidence' contained in a videotape." *Duran*, 396 S.W.3d at 570 (quoting *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000)). "When the trial court does not file findings of fact concerning its ruling on a motion to suppress, we assume that the court made implicit findings that support its ruling, provided that those implied findings are supported by the record." *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). "The appellate court then reviews the trial court's legal ruling de novo unless the supported-by-the-record implied fact findings are also dispositive of the legal ruling." *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

As mentioned earlier, in his initial set of arguments, Edwards argues that the continued investigation after his request for an attorney constituted a violation of his constitutional right to an attorney. Edwards notes in his brief that his trial attorney mentioned the Sixth Amendment and Article I, Section 10 of the Texas Constitution when asserting that his right to counsel was violated. Both Article I, Section 10 and the Sixth Amendment list certain

procedural rights for defendants in criminal prosecutions, including the right to counsel. U.S. Const. amend. VI; Tex. Const. art. I, § 10. To the extent Edwards is suggesting that his mentioning his desire for an attorney invoked the right under these provisions, we note that the Sixth Amendment right attaches "only at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia*, 467 U.S. 180, 187 (1984); *see also Forte v. State*, 707 S.W.2d 89, 92 (Tex. Crim. App. 1986) (explaining that Sixth Amendment right to counsel attaches "when formal adversary proceedings were initiated"). Similarly, the right to counsel under Article I, Section 10 does not attach until a "critical stage" of the criminal process has been reached. *Price v. State*, 870 S.W.2d 205, 207 (Tex. App.—Fort Worth 1994), *aff'd on other grounds by* 887 S.W.2d 949 (Tex. Crim. App. 1994).

The recordings and testing at issue occurred before any charges had been filed against Edwards, meaning that his "Sixth Amendment right to counsel had not yet attached." *Vidmer v. State*, No. 04-01-00395-CR, 2002 WL 31557282, at *3 (Tex. App.—San Antonio Nov. 20, 2002, no pet.) (mem. op., not designated for publication) (determining that admission of recording in which officer asked defendant to submit to field-sobriety testing and in which defendant repeatedly asked for attorney did not violate Sixth Amendment); *see Forte*, 707 S.W.2d at 92 (concluding that defendant was not denied right to counsel under Sixth Amendment at time of his arrest and when he gave breath sample because he was not charged until following day). Similarly, the right under Article I, Section 10 had not attached. *See Floyd v. State*, 710 S.W.2d 807, 810 (Tex. App.—Fort Worth 1986, pet. dism'd) (determining that "right to counsel under . . . Texas Constitution[] did not attach at time he refused to take a breath test"); *see also Price v. State*, 923 S.W.2d 214, 218 (Tex. App.—Eastland 1996, pet. ref'd)

18

(explaining that "the Texas constitutional and statutory provisions [regarding self-incrimination] do not provide any greater protection than the federal provisions").

In his suppression motion, Edwards also generally referred to the Fifth Amendment. To the extent that he is attempting to also assert on appeal that his Fifth Amendment rights were violated, we would be unable to sustain this issue. Although the Fifth Amendment does not specifically mention a right to counsel, *see* U.S. Const. amend. V, the right to counsel under that Amendment derives from the protection against self-incrimination in custodial interrogations, *Pecina v. State*, 361 S.W.3d 68, 75 (Tex. Crim. App. 2012). "[T]he Fifth Amendment right to interrogation counsel is triggered by the *Miranda* warnings that police must give before beginning any custodial questioning." *Id.* at 71. "[T]he *Miranda* right to counsel—with all of its prophylactic protections—becomes ripe for invocation only after (1) *Miranda* warnings have been given while the suspect is in custody or (2) if custodial *Miranda* warnings have not been given, when custodial interrogation begins." *State v. Johnson*, 707 S.W.3d 256, 262 (Tex. Crim. App. 2024).

In this case, the trial court could have reasonably found that Edwards was not in custody or subject to interrogation when asked to perform the field-sobriety tests. *See Vidmer*, 2002 WL 31557282, at *2. "Questions normally accompanying the processing of a D.W.I. arrestee do not constitute interrogation." *Griffith v. State*, 55 S.W.3d 598, 603 (Tex. Crim. App. 2001). More specifically, a police inquiry into whether a suspect will submit himself to a field-sobriety test is not an interrogation. *See id.* Accordingly, his requesting an attorney before

19

and during the field-sobriety testing did not render the continued investigation a violation of his right to an attorney under the Fifth Amendment.[1]

Regarding Edwards's second set of arguments, he suggests that the evidence should have been suppressed because it was obtained in violation of the prohibitions against self-incrimination found in Article I, Section 10 of the Texas Constitution. *See* Tex. Const. art. I, § 10; *see also* Tex. Code Crim. Proc. art. 38.23 (providing that no evidence obtained by police in violation of Texas Constitution, United States Constitution, or governing laws "shall be admitted in evidence against the accused on the trial of any criminal case"). Under that provision, an individual "shall not be compelled to give evidence against himself." Tex. Const. art. I, § 10. Although Edwards argued below that the Texas Constitution provided greater protection than the federal counterpart found in the Fifth Amendment to the United States Constitution, the Court of Criminal Appeals has determined that the Texas provision does not provide greater protection than does the federal one. *See Thomas v. State*, 723 S.W.2d 696, 703, 704 (Tex. Crim. App. 1986); *Olson v. State*, 484 S.W.2d 756, 762, 772 (Tex. Crim. App. 1969) (op. on reh'g); *see also Carroll v. State*, 68 S.W.3d 250, 253 n.3 (Tex. App.—Fort Worth 2002, no pet.) (explaining that self-incrimination clause in Texas Constitution "gives no greater rights than does the Fifth

---

[1] In his brief, Edwards points to an opinion from our sister court of appeals in which it focused on how a defendant had not requested an attorney when performing a "skills test" that was videotaped when deciding that the recording did not need to be suppressed. *See Townsend v. State*, 813 S.W.2d 181, 183, 186 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd). From this, Edwards reasons that asking for an attorney must have some significance here. However, in that case, the defendant had already completed and failed field-sobriety tests and had been arrested and *Mirandized* before performing the skills test in question at a jail. *Id.* at 183, 186. Accordingly, the issue and circumstances present in *Townsend* differ from those in the current case, and based on those differences, we do not find *Townsend* persuasive. *Cf. Sutton v. State*, 706 S.W.3d 482, 489 n.2 (Tex. App.—Austin 2024, no pet.) ("[C]ases from our sister courts of appeals are not binding precedent.").

Amendment"). Accordingly, in our analysis, we will rely on cases applying to the Fifth Amendment as well as those applying to the Texas counterpart.

Courts considering the applicability of self-incrimination protections distinguish between testimonial compulsion and the collection of physical evidence. *See Thomas*, 723 S.W.2d at 703. Both the federal and Texas "privileges against self-incrimination are aimed at preventing *involuntary* testimonial incrimination" but do not prevent the police from forcefully collecting physical evidence from a defendant. *Id.* at 703, 704. For testimonial incrimination, the protections only protect a defendant from providing evidence that is both testimonial and compelled. *Id.* at 703. "[T]he Fifth Amendment is limited to prohibiting the use of 'physical or moral [mental] compulsion' exerted on the person asserting the privilege." *Fisher v. United States*, 425 U.S. 391, 397 (1976). "Physical compulsion includes such obvious force as physical torture or extended deprivation of food and water." *Thomas*, 723 S.W.2d at 704. "Mental compulsion includes the more subtle force associated with offering a defendant two choices, one of which results in a penalty, punishment or detriment from which the defendant is entitled to be free." *Id.* "Notably, both physical and mental compulsion remove the element of *voluntariness* from a defendant's decision to incriminate himself." *Id.*

A recording of field-sobriety testing "is not testimonial in nature and therefore does not offend the Fifth Amendment privilege against self-incrimination." *Miffleton v. State*, 777 S.W.2d 76, 80 (Tex. Crim. App. 1989). Likewise, the "admission of the visual portion of the videotaped sobriety test d[oes] not offend the Texas constitutional privilege against self-incrimination because the videotape [i]s not compelled testimony." *Id.* "[A] defendant's performance during field sobriety tests is not testimonial in nature, but is physical evidence of the functioning of the defendant's mental and physical faculties." *Shpikula v. State*, 68 S.W.3d

21

212, 219 n.5 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). There is "no meaningful distinction between obtaining a film of a defendant performing a sobriety test and obtaining a sample of breath, blood, urine, or handwriting, or submitting a defendant to fingerprinting, photographing, or measurements." *Miffleton*, 777 S.W.2d at 80; *see also Arthur v. State*, 216 S.W.3d 50, 54 (Tex. App.—Fort Worth 2007, no pet.) (emphasizing that field-sobriety tests "yield physical evidence of a suspect's mental and physical faculties, and thus, the results are not testimonial evidence"). In fact, Texas law permits law enforcement to compel field-sobriety tests as non-testimonial physical evidence, even through explicit threats of arrest or physical intervention. *Blackwell v. State*, 721 S.W.3d 686, 696 (Tex. App.—San Antonio 2025, pet. ref'd).

Additionally, Edwards was given the option of submitting to field-sobriety testing and was told that he could refuse to comply. Edwards took his time when deciding to perform the testing and felt free to interrupt and question the officers about the need for the testing and how it should be performed. "Nothing in the record indicates that [he] was physically coerced into" submitting to the testing, "[n]or does anything in the record indicate that he was mentally coerced into choosing" to submit to testing. *See Thomas*, 723 S.W.2d at 705. Similarly, although Edwards answered the officers' questions about whether he had consumed alcohol that day, how intoxicated he felt at the time, and when he drove, the trial court could have reasonably found that the officers did not physically or mentally compel him to answer those questions. *See Miffleton*, 777 S.W.2d at 81 (concluding that trial court should have suppressed audio portion of recording where recording was made at police station and where it was "uncontested that the videotape was taken in a custodial setting"); *see also State v. Stevenson*, 958 S.W.2d 824, 829 n.7 (Tex. Crim. App. 1997) (noting that officer's asking "questions during a continuing

22

investigation and administer[ing] sobriety tests" where officer manifested no "intent to arrest until appellee was formally arrested" did not establish custody); *Shpikula*, 68 S.W.3d at 218-19 (determining that defendant's admission to drinking following questioning was proper because DWI investigation that includes questioning and field-sobriety testing did not constitute "custodial interrogation").

To the extent that Edwards suggests that he was having a mental-health crisis at the time of the testing and that this Court should create an exception that would prohibit the admission of evidence of sobriety testing in those circumstances, we have not been pointed to nor found any support for that proposition. *See Moss v. State*, 13 S.W.3d 877, 886 (Tex. App.—Fort Worth 2000, pet. ref'd) (noting limited ability of intermediate court of appeals to create new law); *see also State v. Ortiz*, 382 S.W.3d 367, 373 (Tex. Crim. App. 2012) (explaining that standard for whether person is in custody is objective and considers what reasonable person in that position would believe).

For these reasons, Edwards was not compelled to incriminate himself, and the trial court did not abuse its discretion by denying Edwards's other suppression motion. *See* U.S. Const. amend. V; Tex. Const. art. I, § 10.

**Motion for Mistrial**

In his final issue, Edwards argues that the trial court should have granted his motion for mistrial. Edwards requested a mistrial after the State finished its direct examination of the apartment employee. During a hearing held outside the presence of the jury, Edwards asserted that although he had made discovery requests pertaining to statements from any of the State's witnesses, no disclosures were made pertaining to the portions of the employee's

testimony concerning how she left the reception area to personally observe Edwards in the Escalade, how she saw Edwards move his car more than once, how she observed the Escalade nearly collide with her car, and how she activated her car's alarm to prevent the collision from happening. At the hearing, Edwards referenced how the State mentioned those events during its opening statement but had failed to disclose evidence pertaining to them. He also contended that the information was not in any police report. The State responded by saying that there was no written statement from the apartment employee and that the information at issue had been disclosed through body camera footage capturing a conversation in which the employee told an officer that Edwards almost hit her car and from surveillance footage showing Edwards having difficulty parking and showing the lights from the employee's car flashing. The State also explained that Edwards had the opportunity to talk with the employee. After considering the parties' argument, the trial court denied the motion for mistrial.

On appeal, Edwards notes that his trial attorney filed a discovery request under article 39.14 of the Code of Criminal Procedure before trial and argues that the request was ignored as it pertained to the apartment employee. *See* Tex. Code Crim. Proc. art. 39.14(a) (requiring on timely request that State produce and permit inspection and copying of reports and other tangible items "not otherwise privileged that constitute or contain evidence material to any matter involved in the action"). Further, Edwards asserts that "[a]rguably[] the testimony of the [employee] was not disclosed until right before trial" and that "[t]he prosecutor may not have exercised due diligence in finding discoverable items." Additionally, he suggests that his "trial attorneys did not have critical information about their case until the very day of trial" and that the untimely disclosure by the State violated article 39.14. Accordingly, he suggests that the trial court erred by denying his motion for mistrial.

24

As an initial matter, we note that the State asserts that Edwards failed to preserve this complaint by failing to timely move for a mistrial. Generally, to preserve error for appeal, a defendant must make a timely, specific objection, request, or motion to the trial court stating the specific grounds for the ruling sought by the complaining party, unless the specific grounds were apparent from the context. Tex. R. App. P. 33.1(a). Preservation of error is a "systemic requirement" on appeal. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). "An appellant fails to preserve error by failing to object when he had the opportunity." *Burt v. State*, 396 S.W.3d 574, 577-78 (Tex. Crim. App. 2013). "To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and [] do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). Appellate courts should not address the merits of an issue that has not been preserved for appellate consideration. *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).

The traditional path is to follow a three-step process under which a party objects to testimony, requests an instruction for the jury to disregard the testimony, and then moves for a mistrial. *See Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). Although it is not always necessary that all three steps be performed, there must be "a timely, specific request that the trial court refuses." *Id.* "[I]f a party delays [making a] motion for mistrial," "the party could no more rely on the untimely motion for mistrial than on an untimely objection." *Id.* at 70; *see also Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007) (noting that motion for mistrial "must be both timely and specific" and explaining that "[a] motion for mistrial is timely only if it is made as soon as the grounds for it become apparent").

25

In its opening statement, the State mentioned that witnesses would testify that Edwards was driving throughout the parking lot, that the apartment employee saw the vehicle in question being driven oddly and slowly, that the employee witnessed the vehicle nearly collide with her car, and that the employee later saw Edwards in the vehicle in a different parking lot. During the early portion of her direct testimony, the employee explained that she saw an Escalade being driven slowly, that the Escalade nearly struck her car, and that she activated her car's alarm to get the driver's attention. Later in her testimony, the employee testified that she went to the other parking lot to confirm that the Escalade was there, saw that it "wasn't parked properly," and observed Edwards in the Escalade before calling 911. Following this testimony, the State continued to question the witness and played security footage from the apartment and a recording of the employee's 911 call. The employee repeated some of the prior testimony including where she found Edwards in the Escalade.

Edwards did not move for a mistrial on the grounds alleged on appeal until after the State finished its direct examination of the employee. Under these circumstances, we agree with the State that Edwards failed to preserve this issue for appellate consideration because his motion for mistrial was not timely. *See Cano v. State*, No. 13-23-00275-CR, 2024 WL 3197480, at *4 (Tex. App.—Corpus Christ-Edinburg June 27, 2024, no pet.) (mem. op., not designated for publication) (determining that defendant's motion for mistrial asserting that witness's testimony "was absent from the discovery provided . . . ahead of trial" was untimely when defendant waited until conclusion of witness's direct examination to move for mistrial); *see also Foyt v. State*, 602 S.W.3d 23, 49-50 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (concluding that motion for mistrial asserting that State failed to disclose under article 39.14 was not timely when defendant did not move for mistrial during witness's direct examination by State and

26

instead waited until next day after witness had left witness stand); *Veras v. State*, 410 S.W.3d 354, 358 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("If a party delays in moving for a mistrial and, by failing to object, allows for the introduction of further objectionable testimony or comments and a greater accumulation of harm, the motion for mistrial is untimely and preserves nothing for appellate review.").

Additionally, Edwards did not move for a continuance. The Code of Criminal Procedure specifically authorizes a trial court to grant a continuance after a trial has begun. *See* Tex. Code Crim. Proc. art. 29.13. A request for a continuance is necessary to preserve a complaint regarding article 39.14 because, if granted, it would afford the defendant "the opportunity to avoid the prejudice and impairment." *See Rodriguez v. State*, 630 S.W.3d 522, 524 (Tex. App.—Waco 2021, no pet.); *see also Lindley v. State*, 635 S.W.2d 541, 542-43, 544 (Tex. Crim. App. 1982) (overruling issue that State failed to disclose defendant's statements to officer in compliance with discovery order and explaining that "[t]he failure to request a postponement or seek a continuance waives any error urged in an appeal on the basis of surprise."). Accordingly, Edwards failed to preserve his complaint concerning article 39.14 by not requesting a continuance. *See Ruffins v. State*, 691 S.W.3d 166, 186-87 (Tex. App.—Austin 2024, no pet.) (determining that defendant failed to preserve complaint that State failed to disclose under article 39.14 that detective believed he heard defendant's nickname being said on surveillance footage).

For these reasons, we overrule Edwards's final issue on appeal.

**CONCLUSION**

Having overruled all of Edwards's issues on appeal, we affirm the trial court's judgment of conviction.

_____
Karin Crump, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   April 30, 2026

Do Not Publish